**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0309n.06

**No. 09-6536**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Mar 20, 2012**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| CHRISTOPHER KELSO, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE:  GRIFFIN and KETHLEDGE, Circuit Judges; and THAPAR, District Judge.[*]

GRIFFIN, Circuit Judge.

Defendant Christopher Kelso appeals his convictions for conspiracy to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) ("Count One") and conspiracy to commit financial transactions involving the proceeds of an unlawful activity (i.e., money laundering), in violation of 18 U.S.C. § 1956(h) and (a)(1)(A)(i) ("Count Two").  We affirm.

I.

The events giving rise to this case began in 2004 when Shermond Alsup of Knoxville, Tennessee, contacted Jefferson Bivings of Atlanta, Georgia, whom he had met in prison, to obtain cocaine for distribution in the Knoxville area.  Alsup then contacted Dex Hines.  Alsup knew Hines

_____

[*]The Honorable Amul R. Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

from his neighborhood in Knoxville and from previous drug transactions. Alsup told Hines that he had a cocaine source in Atlanta and proposed that the two of them jointly purchase a kilogram of cocaine from Bivings, which they would then split and sell separately. Hines agreed.

Alsup and Hines initially began to purchase one kilogram of cocaine from Bivings every few weeks; over time, however, they worked their way up to purchasing several kilograms twice a month. The two men picked up the cocaine from Brent Ooten, an associate of Bivings, at Ooten's car wash and other locations in Atlanta. They would bring cash in a bag and give the bag to Ooten, who in turn would give them the cocaine. They would then sell the cocaine in the Knoxville area and use proceeds of those sales to buy more cocaine.

Eventually, Alsup, Hines, Bivings, and Ooten agreed to conduct some of the cocaine transactions in Chattanooga, since it was conveniently located about halfway between Knoxville and Atlanta. The procedure in Chattanooga was much the same as it was in Atlanta: Alsup and/or Hines would drive from Knoxville with the money, and Ooten and/or Bivings would drive from Atlanta with the cocaine and the parties would make a brief exchange. The location for the exchange would be at one of two Chattanooga apartment complexes.

After approximately two years, the conspiracy expanded. Hines testified that he took Kelso, a long-time friend, fellow motorcycle club member, and cocaine customer who was currently selling to individuals in the Knoxville area, into the conspiracy to take his place. Kelso, according to Hines, wanted to get involved with Bivings so that he could obtain more cocaine and make more money. As Hines put it, "I was introducing [Kelso] to [Alsup, Bivings, and Ooten]. I was going to be done

with it. . . . [Kelso] will be doing it on his own."

The introduction came in late September or early October 2006 when Hines brought Kelso with him to Chattanooga to purchase five kilograms of cocaine from Bivings. Hines testified that on this trip Kelso contributed some money so that he could obtain a portion of the cocaine for himself. Because Hines did not tell Alsup that Kelso would be accompanying him, and because Bivings spoke only to Alsup on the phone, Bivings was surprised and concerned to see Kelso at the exchange.

Nonetheless, Kelso went on the next trip too. On October 18, 2006, Kelso accompanied Hines and Alsup to Chattanooga to purchase seven kilograms of cocaine from Bivings. Kelso knew that he was going to be transporting cocaine, agreed to do so in exchange for compensation from Alsup and Hines, and contributed $7,000 of his own money for the cocaine purchase. Hines and Kelso rode together in Kelso's wife's Toyota Highlander, while Alsup drove his own vehicle. After stopping for breakfast, the men went to meet Ooten.

The meeting did not go as planned. As Kelso and Hines neared the apartment complex, Hines spotted what he believed to be an unmarked police vehicle, and he and Kelso drove away. Hines, it turned out, was correct in his identification of the unmarked police vehicle: the Drug Enforcement Administration ("DEA") had been tracking their cocaine distribution activities via a wiretap and had been surveilling the transaction. Alsup and Ooten attempted to arrange a meeting at the alternative location, but were unsuccessful.

The men were subsequently arrested. Alsup was pulled over by DEA agents in Chattanooga.

Hines and Kelso were also detained in Chattanooga, though not before agreeing that if they were arrested, they would say that they had traveled to Chattanooga to look at some motorcycles, which seemed plausible to them given that they had looked at motorcycles together before. And Ooten was apprehended by Fort Oglethorpe police officers in Georgia.

Federal indictments followed. Kelso was charged with conspiracy to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) ("Count One"); conspiracy to commit financial transactions involving the proceeds of an unlawful activity (i.e., money laundering), in violation of 18 U.S.C. § 1956(h) and (a)(1)(A)(i) ("Count Two"); and conspiracy to cause bodily injury to a person in retaliation for providing information to law enforcement officials, in violation of 18 U.S.C. § 1513(b)(2) and (e) ("Count Three"). The case went to trial.

Kelso's trial testimony contrasted sharply with the testimony of his co-conspirators. He claimed that he had no knowledge of any planned cocaine purchase on the day of his arrest; denied ever having any conversations with Hines about buying and selling cocaine; and asserted that Hines had told him they were going to Chattanooga to pick up a motor and to look at motorcycles. Indeed, Kelso intimated that he believed they were going to look at motorcycles right up until the time the police arrested them. His wife also testified that he went to Chattanooga to look at motorcycles.

Kelso sought expert help in undermining the opposing testimony. Specifically, he moved to introduce testimony from a defense attorney regarding the sentencing practices in federal court to show that witnesses who are defendants in related cases have an incentive to help the government with their testimony in order to obtain a sentence reduction. The main target of this proposed expert

testimony was Hines, who had altered his original statement to police – that Kelso had nothing to do with the cocaine transaction – and testified at trial that Kelso was a fellow conspirator. The magistrate judge granted the United States's motion to exclude the expert testimony, and the district court affirmed the magistrate judge's order.

The jury returned a mixed verdict. It found Kelso guilty of conspiracy to distribute cocaine and conspiracy to launder money, but not guilty of conspiracy to cause bodily injury to a person in retaliation for providing information to law enforcement officials. Kelso moved for a new trial alleging several errors, but that motion was denied. Several months later, Kelso again moved for a new trial, this time on the basis of newly discovered evidence, i.e., evidence of the possible coordination of testimony between Alsup and Hines. The district court denied that motion as well.

Kelso timely appeals.

## II.

Kelso argues that (1) there was insufficient evidence to sustain his convictions; (2) the district court abused its discretion when it granted the government's motion to exclude his proposed expert testimony; and (3) the district court abused its discretion when it denied his motion for a new trial based on the alleged newly discovered evidence. We address these arguments in turn.

## A.

Kelso first claims, citing this court's decisions in *United States v. Craig*, 522 F.2d 29, 31 (6th Cir. 1975) (finding that defendant's driving of the co-defendant to an apartment with a closed box of drugs, without proof of agreement among the parties, was not enough to establish a conspiracy)

and *United States v. Morrison*, 220 F. App'x 389, 395 (6th Cir. 2007) (finding insufficient evidence to support defendant's conviction for conspiracy to distribute cocaine where there was no evidence that defendant knew the purpose of the illegal activity centered around drugs), that there was insufficient evidence to sustain his conviction for conspiracy to distribute cocaine. He asserts that this case is "considerably weaker" than *Craig* and *Morrison* "because not only is there no evidence he knew there was a particular sort of contraband . . . in his vehicle, but also there is not any evidence that he knew there was any contraband in the car." Rather, according to Kelso, "the record . . . clearly reflects [that] . . . his alleged participation encompassed less than twenty-four hours and amounted to his driving with a friend from Knoxville to Chattanooga." We are not convinced.

When reviewing the sufficiency of the evidence in support of a jury verdict, we view the evidence in the light most favorable to the government and determine whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006). We do not "reweigh the evidence, reevaluate the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Deitz*, 577 F.3d 672, 677 (6th Cir. 2009) (internal quotation marks omitted). Moreover, "it is not necessary for us to exclude every reasonable hypothesis but guilt." *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997). To sustain a conviction for conspiracy under 21 U.S.C. § 846, the government must have proved beyond a reasonable doubt: (1) an agreement to violate the drug laws, in this case 21 U.S.C. § 841(a)(1); (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy. *United States v. Sliwo*, 620 F.3d 630, 633 (6th Cir. 2010). Proof of the agreement may be

circumstantial or direct, and the prosecution need not show a formal or express agreement among the co-conspirators; a tacit or mutual understanding is sufficient. *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007).

The problem with Kelso's arguments is that they are not supported by the record. The testimony showed that Kelso knowingly agreed to drive the cocaine from Chattanooga to Knoxville in exchange for payment from Alsup and Hines; that Kelso was trying to permanently join Alsup and Hines in their cocaine purchases; that Kelso joined Hines on two such occasions and contributed money toward the purchase of cocaine both times; and that Kelso would eventually be taking over for Hines. Kelso simply ignores this evidence, claiming that Hines's testimony was "uncorroborated." However, "it is well-settled that uncorroborated testimony of an accomplice may support a conviction in federal court." *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010) (internal quotation marks omitted). Moreover, not all of Hines's testimony was uncorroborated; for example, while Kelso claimed that he had never been to Chattanooga with Hines prior to his arrest, both Hines *and* Bivings testified that Hines had brought Kelso on a previous trip. Because we may not reweigh the evidence, reevaluate the credibility of witnesses, or substitute our judgment for that of the jury, *Deitz*, 577 F.3d at 677, Kelso's challenge to his conspiracy conviction must be rejected.

Kelso next contends that the reasons that "negate his involvement in the drug conspiracy . . . apply to the money laundering conspiracy charge as well." We disagree. Kelso was charged with conspiring to violate 18 U.S.C. § 1956(a)(1)(A)(i), which prohibits promotional money laundering, i.e., "the reinvestment of proceeds of unlawful activity into the illegal scheme from

which the proceeds were derived." *United States v. Crosgrove*, 637 F.3d 646, 654 (6th Cir. 2011). "The paradigmatic example of this crime is a drug dealer using the proceeds of a drug transaction to purchase additional drugs and consummate future sales." *United States v. Warshak*, 631 F.3d 266, 317 (6th Cir. 2010). To sustain a conviction for promotional money laundering, the government must prove that the defendant: (1) conducted a financial transaction that involved the proceeds of unlawful activity; (2) knew the property involved was proceeds of unlawful activity; and (3) intended to promote that unlawful activity. *United States v. Prince*, 618 F.3d 551, 554 (6th Cir. 2010).

This court's decision in *United States v. King*, 169 F.3d 1035 (6th Cir. 1999) provides a useful example. In that case, the defendant argued that the evidence was insufficient to support his conviction for conspiracy to engage in promotional money laundering. The evidence showed, however, that "King coordinated a multi-person drug distribution business"; "had a minimal amount of income from legitimate sources" while his wire transfer payments for drugs were large; and had "wired funds to his couriers in payment for prior marijuana deliveries." *Id.* at 1039. On this record, we held that there was sufficient evidence to sustain King's conviction because a rational trier of fact "could find that the wire transfers involved the proceeds of unreported drug transactions" and that "King intended to 'promote' his ongoing drug business." *Id.*

This case is much the same. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found Kelso guilty of the essential elements of promotional money laundering. Alsup and Hines testified that they had an agreement to use the proceeds from their sales of cocaine to purchase more cocaine from Bivings, and Hines testified that

Kelso would be taking over Hines's role in the cocaine conspiracy.  Additionally, Kelso contributed large amounts of cash to purchase cocaine from Bivings and Ooten twice, and he had numerous debts, no assets, and no significant source of income other than selling cocaine, such that a rational trier of fact could conclude that at least part of the $7,000 Kelso contributed on his second trip to Chattanooga came from the sale of the cocaine he purchased during his first trip.  This evidence was sufficient to sustain Kelso's conviction.

B.

Next, Kelso argues that the district court abused its discretion in granting the government's motion to exclude his proposed expert testimony regarding the incentive that witnesses who are defendants in related cases have to cooperate with the government in order to obtain a lesser sentence.  This argument is without merit.  In *United States v. Thomas*, 74 F.3d 676 (6th Cir. 1996), a defendant similarly claimed that the district court abused its discretion by refusing to allow him to introduce testimony from an experienced federal criminal practitioner about the incentive a witness would have to give false testimony as a result of a plea agreement containing a promise of a reduced sentence in exchange for cooperating with the government.  This court rejected that claim.  We held that "the district court in the instant case did not abuse its discretion by finding that the jury could fully understand, without expert testimony, the incentive a government witness might have to lie under oath, and that therefore the proposed testimony would not be helpful to the jury here." *Id.* at 683-84.  That holding, as Kelso admits, applies with equal force here.

To be sure, Kelso asks us "to reconsider" our conclusion in *Thomas*.  But even if we wanted

to, we have no power to grant Kelso's request. *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) ("A panel of this Court cannot overrule the decision of another panel."). Moreover, there is no reason to think that Kelso is right, and that *Thomas* is wrong. Kelso has cited no case in which a court has concluded that excluding such testimony was an abuse of discretion; at least one other circuit shares the view expressed in *Thomas* that it is not, *see United States v. French*, 12 F.3d 114, 117 (8th Cir. 1993) (concluding that "it is clearly within the realm of common sense that certain witnesses would have an incentive to incriminate the defendant in exchange for a lower sentence" and that "[t]he credibility of witnesses is a determination for the factfinder"); and we have continued to endorse that view in subsequent cases, *see, e.g., United States v. Henry*, 71 F. App'x 493, 503-04 (6th Cir. 2003) (per curiam). Accordingly, we hold that the district court did not abuse its discretion in excluding Kelso's proposed expert testimony.

C.

Finally, Kelso claims that the district court abused its discretion in denying his motion for a new trial based on newly discovered evidence. However, in his initial brief on appeal, Kelso merely set out the standard of review and the elements of the claim; he did not argue or explain how that standard or those elements were satisfied in this case. Furthermore, even though the government argued in its response that Kelso's new-trial claim was waived and failed on the merits, Kelso did not so much as mention that claim in his reply. Because Kelso has not presented any argument in support of his claim that the district court abused its discretion in denying his motion for a new trial based on newly discovered evidence, we deem that claim waived. *McPherson v. Kelsey*, 125 F.3d

989, 995-96 (6th Cir. 1997) (explaining that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal quotation marks omitted).

III.

For these reasons, we affirm the judgment of the district court.