**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0701n.06

No. 08–1930

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Nov 15, 2010**
LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

ROBERT JAMES OCAMPO,
    *Defendant-Appellant*.

On Appeal from the
United States District Court for
the Eastern District of Michigan

_____

Before:  KEITH, KENNEDY, and COOK, Circuit Judges

**CORNELIA G. KENNEDY, Circuit Judge.**  Defendant Robert Ocampo was convicted and sentenced to 360 months imprisonment on various drug and firearm offenses stemming from his involvement in a marijuana and cocaine trafficking conspiracy.  He now appeals both his conviction and sentence on numerous grounds, alleging error in the district court's denial of a motion to suppress evidence, exclusion of certain hearsay testimony, denial of a motion to acquit based on the sufficiency of the evidence, failure to act on a purported *Brady* violation, and calculation of his advisory Sentencing Guidelines range.  Because we find each of Defendant's claims to lack merit, we hereby affirm the district court.

**FACTUAL AND PROCEDURAL BACKGROUND**

On October 18, 2006, the Government filed a fourth superseding indictment charging Defendant and co-defendants Kip Perry, Bruce Perry, Phil Perry, Theresa Perry, Phillip Gianfortuna, and Jose Sandoval with various crimes connected to their participation in a drug trafficking

conspiracy centered in Saginaw, Michigan (the "Kip Perry operation"). The charges were based on long-term surveillance of individuals involved in the Kip Perry operation as well as evidence collected from searches of various premises connected with each co-defendant. We briefly recount here the evidence presented at Defendant's trial.

Between January of 2005 and March of 2006, Defendant made at least twenty eight trips between Michigan and various out-of-state locations, primarily El Paso, Texas and various cities in California. Additional evidence suggested that Defendant's behavior on many of these trips was consistent with drug trafficking activities. For example, between June 11 and June 13 of 2005, Defendant traveled to Los Angeles, California—a major hub for cocaine trafficking—where he purchased cling wrap, duct tape, and a piece of luggage—all materials that are commonly used to package and transport narcotics. Furthermore, Defendant's financial records show he spent $99,294.44 during those fifteen months, though his tax returns disclose reported income of only $12,920 in 2005 and payroll statements show only $3,400 in earnings from January 1 to March 10 of 2006.

One of Defendant's trips occurred between December 2 and 10, 2005, during which he flew from Detroit to Los Angeles by way of El Paso, then drove back to Saginaw. On December 10, 2005, Phillip Gianfortuna rented a hotel room less than a mile from his home in Saginaw.[1] On December 12, 2005, a government informant wearing a body wire met Kip Perry at Perry's home, where Perry sold the informant nine ounces of cocaine and gave him a small amount of marijuana. During the recorded conversation between Perry and the informant, Perry said that "Phillip's friend"

---

[1]Drug dealers often use nearby hotels as neutral locations in which to conduct drug transactions.

brings in 10 kilograms of cocaine and 2,000 pounds of marijuana at a time. Perry also mentioned that he had told Phillip to tell his friend to stop snorting, which was interpreted as a reference to inhalation of cocaine. Also on December 12, Defendant deposited $2,400 in his account at his bank in Saginaw.

On February 6, 2006, Defendant again flew from Detroit to Los Angeles. On February 10, when hotel records place Defendant in Buena Vista, California, law enforcement intercepted a telephone call from Kip Perry to Gianfortuna, during which they discussed something that was likely to occur on Sunday. On February 12, a Sunday, surveillance officers observed Gianfortuna leave his home in Saginaw for approximately fifteen minutes, during which time he accessed two pay phones. Subsequent investigation revealed that the first pay phone was out-of-order, but Gianfortuna had used the second pay phone to call a telephone registered to a Ruben Ocampo and customarily used by Defendant. On February 13, during an intercepted telephone call between Kip Perry and one of his long-time customers for both cocaine and marijuana, Perry stated that his "suppliers" were not around. Meanwhile, Defendant was in the process of driving back to Michigan from California in a rental vehicle; Defendant's records show that he changed rental cars on February 12 in St. Louis, Missouri and again on February 13 in the Detroit area.

On February 14, 2006, Defendant met with Gianfortuna at the latter's residence in Saginaw. Surveillance officers tailed Defendant from Gianfortuna's house to a Saginaw bar, which he left around 1:00AM on February 15. Shortly thereafter, two Michigan State Troopers stopped Defendant for a traffic violation. During the stop, one trooper smelled both green, unsmoked marijuana and marijuana smoke. He also observed a small amount of marijuana in the ashtray of Defendant's

3

vehicle, but it was lost before it could be taken into evidence.[2]  After the traffic stop, Defendant returned to his residence at 410 Sweet Street in Saginaw.

Later in the day on February 15, 2006, agents followed Defendant from Saginaw to Tom's Oyster Bar in Detroit, where he met with a man later identified as Jose Sandoval.  A surveillance officer who overheard the conversation between Defendant and Sandoval reported that Defendant made several statements implying he was involved in drug trafficking.  Defendant stated that he had connections in U.S. cities like Orlando and Los Angeles, as well as South American countries like Peru and Columbia.  He also referenced numbers that the officer interpreted as quantities and prices for marijuana.  Defendant specifically mentioned Gianfortuna, saying "[i]f he comes through, we are going to be okay" or "good."  Defendant's remarks also indicated that he had not worked with Sandoval before, as he explained to Sandoval that things would get easier the more they worked together.  When Defendant and Sandoval left the restaurant, Sandoval transferred a box from the trunk of his vehicle to the trunk of the car Defendant was driving.  During a subsequent search of Defendant's residence, law enforcement discovered $73,431 in cash hidden in a bag with Sandoval's fingerprints on it.

The next day, February 16, 2006, Defendant visited his storage unit in Saginaw before again meeting up with Sandoval.  Surveillance officers followed Defendant and Sandoval to an International House of Pancakes restaurant, in the parking lot of which they saw Defendant transfer a suitcase from the car he was driving to Sandoval's car before the two men parted ways.  Defendant returned to Saginaw, but Sandoval was detained in a traffic stop in the Detroit area.  Officers

---

[2]The troopers also conducted a more thorough search of Defendant's vehicle, person, and cell phone, but the evidence recovered was later suppressed after the district court determined that Defendant did not give valid consent to the search.

searched Sandoval's vehicle and seized the suitcase, which was found to contain sixty one-pound bricks of marijuana.

Sometime between February 19 and 21, 2006, Defendant began a road trip to California by way of Denver, Colorado. On Friday, March 3, 2006, while Defendant was in California, law enforcement intercepted another telephone conversation between Kip Perry and Gianfortuna. Perry asked Gianfortuna what had happened to the "traveling guy." Gianfortuna answered, "I talked to him . . . . I have to wait for him to come back from L.A." Later in the conversation, Gianfortuna said, "I'll stop by Sunday or Monday, see what's happening. Hopefully I'll have good news," which statement officers interpreted as Gianfortuna indicating he was going to contact Kip Perry on Sunday or Monday after hopefully hearing from his supplier. Defendant returned to Saginaw the following Sunday, March 12. He visited his storage unit that same day, and then made a cash deposit of $1,600 into his bank account on March 13.

Defendant was arrested on a federal criminal complaint and warrant on March 16, 2006. That same day, police executed search warrants at Defendant's residence and storage unit. From Defendant's home and person, law enforcement recovered voluminous travel and financial records, a total of $78,431 in cash, several bricks of marijuana packaged for distribution, and a vacuum sealer. In Defendant's refrigerator, officers also found 1.4 grams of marijuana in a baggie with Gianfortuna's fingerprints on it. The search of Defendant's storage unit yielded a Ruger mini-30 rifle with pistol grip and collapsible stock, a loaded 9mm Hipoint rifle, more than 1,200 rounds of ammunition, magazine clips, and two storage totes of documents. A later search of Gianfortuna's residence turned up documents linking him to both Defendant and Kip Perry.

5

Following Defendant's arrest, law enforcement arrested Kip Perry, Gianfortuna, and other individuals linked to the Kip Perry operation. The fourth superseding indictment charged Defendant and his co-defendants Kip Perry, Bruce Perry, Phil Perry, Theresa Perry, Phillip Gianfortuna, and Jose Sandoval with a total of thirty-six counts. Defendant was severed for trial and his case was assigned to Judge Thomas L. Ludington of the Eastern District of Michigan. After the decision of several pretrial motions—including multiple motions to suppress evidence—Defendant was tried before a jury on seven counts: 1) conspiracy to possess with intent to distribute and to distribute at least 5 kilograms of cocaine and at least 100 kilograms of marijuana in violation of 21 U.S.C. § 846; 2) maintaining a residence within 1,000 feet of a school for the purpose of distributing cocaine and marijuana in violation of 21 U.S.C. § 856(a)(1) and 21 U.S.C. § 860; 3) distribution of less than 50 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1); 4) possession with intent to distribute less than 50 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1); 5) felon in possession of a firearm in violation of 18 U.S.C. § 922(g); 6) possession of a firearm by an unlawful user of any controlled substance in violation of 18 U.S.C. § 922(g)(3); and 7) possession of a firearm during a drug trafficking crime in violation of 18 U.S.C. § 924(c). The jury returned a guilty verdict on all counts, as well as a special verdict finding Defendant responsible for conspiracy to possess with intent to distribute 5 kilograms or more of cocaine and 100 kilograms or more of marijuana, and for drug trafficking in a school zone.

The district court sentenced Defendant on July 7, 2008. Adopting the recommendation in Defendant's Presentence Investigation Report ("PSR"), the judge determined that Defendant had a base offense level of 37 due primarily to the estimated quantities of marijuana and marijuana equivalency Defendant had trafficked in furtherance of the drug conspiracy. He further found that

Defendant had enough criminal history points to place him in a criminal history category of VI. (*Id.* at 26.) Additionally, Defendant had three predicate felonies under the Armed Career Criminal Act, 18 U.S.C. § 924(e). These findings resulted in a Guidelines range of 360 months to life for Counts 1–6, with a mandatory consecutive sentence of 60 months for Count 7. The district court sentenced Defendant within the Guidelines to concurrent terms of 360 months each on Counts 1, 2, 5, and 6, and 60 months each on Counts 3 and 4, with a consecutive 60 month term on Count 7. Defendant filed a timely notice of appeal on July 9, 2008.

## ANALYSIS

Defendant challenges several of the district court's rulings affecting his conviction and sentence. He challenges the denial of his motion to suppress the marijuana recovered in the February 16, 2006 traffic stop of Jose Sandoval, the exclusion at trial of hearsay statements allegedly made by his brother Ruben Ocampo, and the denial of his motion to acquit for insufficient evidence on the charges of conspiracy to possess with intent to distribute and to distribute at least 5 kilograms of cocaine and possession of a firearm by an unlawful user of a controlled substance. He also seeks relief for an alleged *Brady* violation resulting from the prosecutor's failure to disclose before trial some information relating to Sandoval's drug trafficking activities. Finally, he asserts that he received an excessive sentence, both because the district court used inadmissible information to calculate the drug quantities for which he was responsible and because he was erroneously designated an armed career criminal. None of these claims provide grounds for reversing Defendant's conviction or sentence.

## I.    Motion to Suppress

Defendant first challenges the district court's refusal to suppress evidence obtained during the February 16, 2006 traffic stop of Sandoval. Defendant claims that the search without a warrant of the suitcase found in Sandoval's vehicle, which officers had observed Defendant transfer from his vehicle to Sandoval's vehicle earlier that day and which was discovered to contain approximately sixty pounds of marijuana, violated the Fourth Amendment. The district court denied Defendant's motion to suppress after concluding that he lacked standing to challenge the seizure of the suitcase.

"'When reviewing the district court's decision regarding a motion to suppress, we review its factual findings for clear error and its legal conclusions *de novo*.'" *United States v. Hughes*, 606 F.3d 311, 315 (6th Cir. 2010) (quoting *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008)); *see also United States v. Pollard*, 215 F.3d 643, 646–47 (6th Cir. 2000) (applying the same standard of review to a district court's holding that the defendant lacked standing to challenge an alleged Fourth Amendment violation). Because the district court denied Defendant's motion, we consider the evidence in the light most favorable to the Government. *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc) (quoting *United States v. Wellman*, 185 F.3d 651, 654–55 (6th Cir. 1999)).

"[I]n determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 140 (1978)). A defendant's "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy" in the places searched or the items seized. *Rakas*, 439 U.S. at 143 (citing *Katz v. United States*, 389 U.S. 347, 353

(1967)).  "A defendant must satisfy a two-pronged test to show a legitimate expectation of privacy: 1) he must manifest an actual, subjective expectation of privacy; and 2) that expectation [must be] one that society is prepared to recognize as legitimate."  *Pollard*, 215 F.3d at 647; *see also Smith v. Maryland*, 442 U.S. 735, 740–41 (1979).  "Whether a legitimate expectation of privacy exists in a particular place or item is a determination to be made on a case-by-case basis."  *United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000).  Aside from a defendant's "proprietary or possessory interest in the place to be searched or item to be seized," some factors that courts have considered when "identifying those expectations which qualify for Fourth Amendment protection" include "whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; [and] whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion."  *Id.*  "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."  *Rakas*, 439 U.S. at 130 n.1.

We accept as not clearly erroneous the district court's determination of the facts surrounding the February 16 stop of Sandoval.  As recounted above, surveillance officers trailing Defendant on February 15, 2006 saw him meet with Sandoval and observed Sandoval give a box to Defendant. The next day, officers saw Defendant again meet up with Sandoval before transferring a suitcase from his vehicle to the trunk of Sandoval's vehicle.  Shortly thereafter, once both Defendant and Sandoval had left the restaurant and Defendant was en route back to Saginaw, the Michigan State Police executed a traffic stop of Sandoval, searched his vehicle, and discovered sixty one-pound packages of marijuana contained in the suitcase Defendant had placed in the trunk.  The district court agreed with the Government that this sequence of events led to a reasonable inference that a

monetary transaction occurred between Defendant and Sandoval, specifically that on February 16 Defendant exchanged the contents of the suitcase for money contained in the box Sandoval had given to Defendant the previous day.

Based on these facts, Defendant did not retain a legitimate expectation of privacy in the suitcase after he transferred it to Sandoval's vehicle. Defendant's entire argument rests on his assertion that he owned the suitcase from which the marijuana was recovered, and that the facts leading up to the stop are also consistent with Defendant giving the suitcase to Sandoval for safekeeping. However, mere ownership of an item searched or seized does not establish a legitimate expectation of privacy; the Supreme Court has "emphatically rejected the notion that 'arcane' concepts of property law ought to control the ability to claim the protections of the Fourth Amendment." *Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980); *see also Rakas*, 439 U.S. at 143 (noting that "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control" whether a given interest is protected by the Fourth Amendment). And, Defendant cannot meet his burden of proving that he had a legitimate expectation of privacy in the suitcase merely by disputing the Government's interpretation of the events leading up to the February 16 stop.

Even if we disregard the inference that Defendant and Sandoval conducted a drug deal during their meetings on February 15 and 16, Defendant's actions do not indicate that he retained a subjective expectation of privacy in the suitcase once he placed it in Sandoval's car. There is no evidence that Defendant intended to use Sandoval's trunk as a secure storage space: besides the fact that an automobile is transient by nature and thus not the ideal location to store an item, Defendant maintained his own residence and an additional off-site storage unit where he kept many possessions.

10

*Cf. Garcia v. Dykstra*, 260 F. App'x 887, 892–93 (6th Cir. 2008) (unpublished decision) (holding that individuals had standing to pursue a Fourth Amendment claim challenging a search of a storage unit in which they had stored items, even though the unit was leased in another individual's name). There is no evidence that Defendant had the intention or ability to reassert control over the suitcase after turning it over to Sandoval: after relinquishing the suitcase, Defendant promptly returned to Saginaw while Sandoval remained in the Detroit area, and Defendant has never suggested that he had a key to Sandoval's vehicle or that he could otherwise access the trunk in order to recover his suitcase. *Cf. United States v. Robinson*, 390 F.3d 853, 873–74 (6th Cir. 2004) (holding that the defendant could not challenge the seizure of a package that had been sent to his expired mailbox and that the mailbox service was entitled to discard or destroy). There is no evidence that Defendant locked the suitcase before placing it in Sandoval's vehicle, that he asked Sandoval not to open the suitcase, or that he otherwise took steps to preserve his privacy with respect to the suitcase. *Cf. United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005) (holding that the defendant maintained legitimate expectation of privacy in closed bag he had requested residents of searched apartment to store for him, when he had not told residents the contents of bag and residents believed they did not have the authority to open it). Because Defendant has not established a legitimate expectation of privacy in the suitcase, the district court did not err in denying his motion to suppress. *Accord United States v. Payne*, 119 F.3d 637, 641–42 (8th Cir. 1997) (affirming district court's holding that the defendant had no legitimate expectation of privacy in suitcase he had possessed only briefly before leaving it in a unit of a condominium complex and then retrieving it only to give it to his co-defendant, who then drove away with it); *United States v. Skowronski*, 827 F.2d 1414, 1417–18 (10th

11

Cir. 1987) (holding that the defendant had no legitimate expectation of privacy in cardboard box he had transferred from the cab of his tractor trailer to the trunk of another individual's car).

## II.      Hearsay Testimony

Defendant also charges as error the district court's failure to admit the proffered testimony of his sister, Hilda Massey, and his daughter, Christina Powers, as to statements allegedly made by Defendant's brother, Ruben Ocampo.[3] Defendant sought to introduce these statements in order to suggest that Ruben, not Defendant, owned the guns police recovered from Defendant's storage unit. According to the proffered testimony, Massey was to testify to statements made by her brother Ruben in the course of a telephone conversation between the two. As she recalls, sometime after Defendant's arrest she spoke with Ruben, who asked Massey about Defendant. Massey replied that "[Defendant]'s very, very upset with you because [Defendant] said what was found in the storage unit [the firearms] was not [Defendant's], that it was yours," to which Ruben said "yes, it was." Powers was to testify to her recollection of a three-way telephone call between herself, her father the Defendant, and her uncle Ruben, which also took place after Defendant's arrest. Powers remembers that during the call, Defendant had confronted Ruben, saying "[I] asked [you] repeatedly to get the weapons out of [my] storage unit and since [you] didn't, now [I'm] taking the fall for everything," to which Ruben "kept repeating 'I'm sorry and I know.'" The district court excluded these statements as hearsay over Defendant's objection that they should be admitted as statements against interest, given that ownership of firearms exposed Ruben, a convicted felon, to criminal liability.

_____

[3]Since Ruben Ocampo shares Defendant's last name, we will refer to him simply as Ruben throughout the opinion.

We review a district court's evidentiary rulings, including those involving hearsay, for abuse of discretion. *United States v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003) (citing *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 716 (6th Cir. 1999)); *see also United States v. Noel*, 938 F.2d 685, 688 (6th Cir. 1991) (applying abuse-of-discretion standard of review to district court's ruling under hearsay exception for statements against interest). "Under this standard, we will leave rulings about admissibility of evidence undisturbed unless we are 'left with the definite and firm conviction that the [district] court . . . committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors or where it improperly applies the law or uses an erroneous legal standard.'" *United States v. Bartholomew*, 310 F.3d 912, 920 (6th Cir. 2002) (alteration and omission in original) (quoting *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002)).

Federal Rule of Evidence 804(b)(3) excludes statements against interest from the general prohibition on hearsay evidence. A court considers three factors when determining whether a statement should be admitted under Rule 804(b)(3). *United States v. Price*, 134 F.3d 340, 347 (6th Cir. 1998) (citing *United States v. Hilliard*, 11 F.3d 618, 619 (6th Cir. 1993)). First, the declarant must be unavailable as a witness, which occurs when the declarant:

> (1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement; or
> (2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so; or
> (3) testifies to a lack of memory of the subject matter of the declarant's statement; or
> (4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or
> (5) is absent from the hearing and the proponent of a statement has been unable to procure the . . . declarant's attendance or testimony[] by process or other reasonable means.

13

Fed. R. Evid. 804(a). "Second, from the perspective of the average, reasonable person, the statement must have been truly averse to the declarant's penal interest, considering when it was made." *United States v. Jones*, 124 F.3d 781, 786 (6th Cir. 1997); *see also* Fed. R. Evid. 804(b)(3) (defining a statement against interest as "[a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true"). Third, "[c]orroborating circumstances must clearly indicate the trustworthiness of the statement." *Price*, 134 F.3d at 347; *see also* Fed. R. Evid. 804(b)(3) ("A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.").

The district court did not abuse its discretion in excluding Massey's and Powers's testimony regarding Ruben's out-of-court statements because Defendant has not established that Ruben was unavailable to testify. Though Massey indicated under oath that at the time of trial Ruben was living in Saginaw, Michigan, well within the court's subpoena jurisdiction, the district judge noted that there was no evidence of any effort on the part of the defense to procure his attendance in court. Defendant's attorney attempted to excuse this failure by explaining that she "assum[ed]" that, if called to testify, Ruben would "take the [F]ifth," based on her experience that she had "never had a witness get on the stand in the face of Miranda warnings and confess to a crime."

In order for a declarant to be unavailable due to the assertion of a privilege, Rule 804(a) requires a "ruling of the court" to exempt the declarant from testifying. Fed. R. Evid. 804(a)(1). The proffer here falls far short of this standard. The defense attorney admitted that, despite her

14

assumption, it was "fair to say" that she did not know what Ruben's testimony would be in court, or whether he in fact would invoke his Fifth Amendment privilege against self-incrimination. While, as the district judge recognized, "calling a witness into a courtroom knowing they're going to exercise the [F]ifth [A]mendment is more than a frowned upon procedure," *see United States v. Ballard*, 280 F. App'x 468, 470–71 (6th Cir. 2008) (unpublished decision) (noting the potential for prejudice to the prosecution "[w]hen a defendant calls a witness to the stand with the understanding that the witness will assert his Fifth Amendment privilege, [because] it becomes impossible to determine whether the privilege is asserted to obfuscate the factfinder or whether it is invoked out of a genuine desire to avoid self-incrimination"), this alone does not excuse Defendant from satisfying his burden of proof as the proponent of this evidence. For example, Defendant's attorney could have avoided the prejudicial effect of having a witness assert his privilege against self-incrimination in front of the jury by questioning Ruben outside of their presence as to whether he wished to assert the privilege. *See United States v. Briscoe*, 742 F.2d 842, 846 (5th Cir. 1984) (determining that a witness was unavailable for the purposes of Rule 804(b)(3) because he had invoked his Fifth Amendment privilege when called as a witness in a hearing away from the jury). Instead, there is no evidence that Defendant attempted to either locate Ruben or ascertain whether he would invoke the Fifth Amendment if called to the witness stand. These circumstances do not establish that Ruben was unavailable to testify, so the district court did not err in excluding the proffered testimony.[4]

---

[4]This court has recognized in dicta that when, under the "specific facts" of a case, "the existence of [a witness]'s privilege and the virtual certainty that he would have asserted it if called as a witness are 'patent,' . . . requir[ing] a new trial on the basis that the Rule 804 procedural requirements were not fulfilled would be 'mere formalism.'" *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006) (quoting *United States v. Thomas*, 571 F.2d 285, 288 (5th Cir. 1978) and

Even if Ruben's statements qualified as statements against interest under Rule 804, their exclusion from evidence would be harmless error, making reversal inappropriate. *See United States v. Branham*, 97 F.3d 835, 851 (6th Cir. 1996) ("[E]ven if the district court erred in sustaining the hearsay objection, we will not reverse if the error was harmless." (citing *United States v. Wiedyk*, 71 F.3d 602, 607 (6th Cir. 1995))). Defendant does not dispute that the firearms were found in his storage unit, and this fact alone is enough to establish his liability for illegally possessing a firearm. *See United States v. Gardner*, 488 F.3d 700, 713 (6th Cir. 2007) (noting that "'[p]roof that the person has dominion over the premises where the firearm is located is sufficient to establish constructive possession'" in order to satisfy the possession requirement of 18 U.S.C. § 922(g)(1) (alteration in original) (quoting *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998))). Whether or not Ruben was the legal owner of the recovered firearms does not negate the conclusion that Defendant possessed them in violation of federal law: in a prosecution for illegal possession of a firearm, "ownership is not necessary to possession, nor are possession and lack of ownership mutually exclusive." *United States v. Miller*, 227 F. App'x 446, 461 (6th Cir. 2007) (unpublished decision) (concluding that even if the district court erred by refusing to admit a co-defendant's statement that he owned the firearms found in the residence he shared with the defendant, any error was harmless

---

*United States v. Young Bros., Inc.*, 728 F.2d 682, 691 (5th Cir. 1984)). This is not a case where strict enforcement of Rule 804(a) is "mere formalism." As discussed above, defense counsel made no effort to ascertain Ruben's willingness to testify or even his whereabouts, even though there was a complete lack of evidence as to whether he was inclined to invoke the Fifth Amendment. *Cf. Johnson*, 440 F.3d at 846 (opining that the prosecution should not be held to the procedural requirements of Rule 804(a) when the declarant of statements admitted at trial as declarations against interest had been a co-defendant charged with the same RICO conspiracy as the defendant and the declarant had not testified at his own trial). Furthermore, it is not "patently" clear that Ruben would be entitled to assert the privilege in the first place: the only evidence that Ruben had been convicted of a felony was the word of Massey.

16

because the defendant was charged with illegally possessing, not owning, the firearms in furtherance of a drug trafficking crime and as a convicted felon). The district court did not err by excluding the proffered testimony of Massey and Powers as inadmissible hearsay, and even if it had, any error would be harmless.

## III.     Motion for Judgment of Acquittal

Defendant next appeals the district court's denial of his motion for a judgment of acquittal, which challenged the sufficiency of the evidence of his conviction for the cocaine aspect of the drug conspiracy charge and for possession of a firearm by an unlawful user of a controlled substance. We review a district court's denial of a motion for judgment of acquittal *de novo*. *United States v. Gibson*, 896 F.2d 206, 209 (6th Cir. 1990). In reviewing Defendant's claim, "we do not weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Abdullah*, 162 F.3d 897, 902 (6th Cir. 1998). Instead, "we must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "Circumstantial evidence alone, if 'substantial and competent,' may support a verdict and need not 'remove every reasonable hypothesis except that of guilt.'" *United States v. Keeton*, 101 F.3d 48, 52 (6th Cir. 1996) (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984)).

### A.     *Conspiracy to Possess with Intent to Distribute and to Distribute Cocaine*

Before turning to the merits of Defendant's sufficiency-of-the-evidence challenge on the cocaine conspiracy charge, we must first address the Government's argument that we need not consider this issue. The Government asserts that because Count 1 of the indictment charged

17

Defendant with conspiring to possess with intent to distribute and to distribute at least 5 kilograms of a substance containing cocaine *and* at least 100 kilograms of marijuana, a guilty verdict of conspiracy with respect to *either* at least 5 kilograms of cocaine *or* at least 100 kilograms of marijuana will sustain Defendant's conviction under 21 U.S.C. § 846. Therefore, the Government alleges, it would be inappropriate to review the sufficiency of the evidence supporting the jury's cocaine verdict, as Defendant failed to challenge the marijuana verdict and vacating the cocaine verdict alone would not overturn Defendant's conviction on Count 1. The Government is correct that, if Defendant prevailed on his motion to acquit with respect to the jury's cocaine verdict, the Defendant's conviction for violating § 846 would stand based on the marijuana verdict. *See Griffin v. United States*, 502 U.S. 46, 56–57 (1991) (applying the rule "'[w]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged'" to "multiple-object and multiple-overt-act conspiracies" (quoting *Turner v. United States*, 396 U.S. 398, 420 (1970))); *United States v. Henry*, 71 F. App'x 493, 498–500 (6th Cir. 2003) (unpublished decision) (rejecting the defendant's sufficiency-of-the-evidence challenge to his conviction under § 846 of conspiracy to possess and distribute cocaine and crack cocaine, when the defendant challenged only the crack cocaine aspect of the conviction and the jury had been instructed that it must find the defendant guilty of conspiring with respect to both substances in order to convict him on the indictment's single count alleging a violation of § 846). However, in Defendant's case, there is a sentencing disparity between the amount of marijuana and the amount of cocaine charged in Count 1 of the indictment. *Cf. Henry*, 71 F. App'x at 500 (noting "there is no disparate sentencing issue here"). The district court sentenced Defendant under the statutory sentencing range for a conspiracy involving at least 5

18

kilograms of cocaine, which was 10 years to life. 21 U.S.C. § 841(b)(1)(A). On the other hand, the statutory sentencing range applicable to 100 kilograms or more of marijuana is 5 to 40 years. *Id.* § 841(b)(1)(B). While Defendant's 360-month sentence does not exceed the 40-year statutory maximum applicable to the marijuana conspiracy, vacating the cocaine verdict would at least shorten Defendant's Guidelines range of 360 months to life, and may have resulted in a lower base offense level under the Guidelines.[5] Therefore, review of Defendant's sufficiency-of-the-evidence claim is appropriate because overturning the cocaine aspect of Defendant's conviction would affect his sentence. *Cf. United States v. Dale*, 178 F.3d 429, 432–33 (6th Cir. 1999) (holding that, when a defendant is convicted of a § 846 conspiracy involving multiple drugs under circumstances when it is unclear for which drug or drugs the jury found the defendant responsible, the defendant must be sentenced according to the lowest statutory-maximum sentence for any of the charged substances).

"In order to show a conspiracy under § 846, the government must prove, beyond a reasonable doubt, '(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy.'" *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999) (quoting *United States v. Welch*, 97 F.3d 142, 148 (6th Cir. 1996)). "[O]nce the existence [of] a conspiracy is shown, the evidence linking an individual defendant to that conspiracy need only be slight." *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006) (citing *United States v. Henley*,

---

[5]The Defendant's base offense level was determined in large part by the district court's conclusion that he was responsible for the distribution of between 10,000 and 30,000 kilograms of marijuana and marijuana equivalent. This finding was premised on the PSR's estimate that, over the life of the conspiracy, Defendant had supplied approximately 43,636 kilograms of marijuana and marijuana equivalency to the Kip Perry operation. Subtracting the cocaine quantities from this number would reduce the total to 13,636 kilograms of marijuana. This significantly smaller quantity might have caused the district court to adopt a base offense level lower than that applicable to 10,000 to 30,000 kilograms of marijuana, considering the Probation Office's use of "very conservative figures" to fix Defendant's base offense level within the 10,000 to 30,000 kilograms range.

19

360 F.3d 509, 514 (6th Cir. 2004)). "[A] defendant's knowledge of and participation in a conspiracy may be inferred from his conduct and established by circumstantial evidence." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005) (citing *United States v. Salgado*, 250 F.3d 438, 447 (6th Cir. 2001)).

Defendant argues that the Government's evidence is insufficient because it does not establish directly Defendant's participation in the Kip Perry operation's cocaine conspiracy, but instead requires a factfinder unjustifiably to build inference upon inference to find Defendant guilty. Under the highly deferential standard of review we apply to sufficiency-of-the-evidence challenges, however, the Government presented enough substantial and competent circumstantial evidence to support the jury's guilty verdict. *See United States v. Hines*, 398 F.3d 713, 719–20 (6th Cir. 2005) (finding that testimony of the defendant's co-conspirators was sufficient evidence of the defendant's conviction for conspiracy to distribute methamphetamine, even though no drugs were found in his possession at the time of his arrest).

First, some of the evidence collected from Defendant suggested that he was involved in cocaine trafficking, even though no physical evidence of cocaine was uncovered in the searches of Defendant's residence and storage unit. Some of the drug records recovered in the search of Defendant's house and storage unit were consistent with cocaine transactions but not marijuana transactions; additionally, in his conversation with Sandoval on February 15, 2006, Defendant claimed to have connections in Peru and Columbia, which are two source areas for cocaine but not for marijuana. Furthermore, a drug expert testified that sophisticated drug dealers often try to separate themselves from their product, and it was not unusual for law enforcement to fail to find any direct evidence of cocaine trafficking in Defendant's home or storage unit. In fact, financial

20

records and two Greyhound bus baggage check tickets recovered from Defendant's residence suggest that Defendant might have paid a courier to transport drugs from California back to Michigan around December 8, 2005, indicating that Defendant did avail himself of a strategy drug dealers often use to avoid being caught traveling with their product.

Second, there was ample evidence that the Kip Perry operation had an agreement to violate drug laws by distributing cocaine as well as marijuana. Substantial distribution quantities of cocaine were found in searches of premises connected with co-conspirators Kip Perry and Phil and Theresa Perry. Third, Defendant undoubtedly had ties to the Kip Perry operation. Many types of evidence linked Defendant to Gianfortuna, including signature packaging material, surveillance, telephone and hotel usage, and documents seized from both Defendant's and Gianfortuna's residences. In turn, Gianfortuna was linked to Kip Perry and his drug operation. Defendant does not dispute that this evidence supports his conviction for his involvement in the Kip Perry operation's conspiracy to distribute marijuana.

Finally, and most importantly, wiretap evidence of conversations involving Kip Perry solidify the conclusion suggested by all the other evidence that Defendant was one of the Kip Perry operation's cocaine suppliers. On December 12, 2005, during a recorded "buy" of cocaine, Kip Perry told a government informant that "Phillip's friend" brings in "10 kilograms and 2,000 pounds at a time," where "10 kilograms" referred to cocaine. A conversation between Gianfortuna and Kip Perry on March 3, 2006 referenced a "traveling guy" who acted as their supplier for both marijuana and cocaine. On both of these occasions, information revealed about "Phillip's friend" and the "traveling guy" was consistent with the paper records of Defendant's travels. A reasonable trier of fact considering all of this evidence could have found beyond a reasonable doubt that Defendant

knew of, intended to join, and participated in the Kip Perry operation's cocaine distribution conspiracy. It was not error for the district court to deny Defendant's motion to acquit on this ground.

### B.     *User of a Controlled Substance in Possession of a Firearm*

Defendant's conviction for violating 18 U.S.C. § 922(g)(3) by being an unlawful user of a controlled substance in possession of a firearm is also supported by sufficient evidence. Section 922(g)(3) prohibits a person "who is an unlawful user of or addicted to any controlled substance" from "possess[ing] in or affecting commerce[] any firearm or ammunition," or from "receiv[ing] any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." Jury instructions adopted by this court clarify that an "unlawful user of a controlled substance" engages in drug use "sufficiently consistent and prolonged as to constitute a pattern of regular and repeated use of a controlled substance." *United States v. Burchard*, 580 F.3d 341, 352 (6th Cir. 2009). To prove a violation of § 922(g)(3), the Government must establish that a defendant "was engaged in a pattern of regular and repeated use of a controlled substance during a period that reasonably covers the time a firearm was possessed." *Id.* Defendant claims that the Government did not present sufficient evidence that he was an "unlawful user of a controlled substance," or that any of Defendant's alleged drug use was sufficiently related to his possession of the firearms recovered from his storage unit. These arguments fail.

The Government presented several pieces of evidence indicating that Defendant was engaged in "regular and repeated use of a controlled substance" in the months leading up to the March 16, 2006 discovery of the firearms kept in Defendant's storage unit. In his December 12, 2005 conversation with a government informant, Kip Perry mentioned that he had told Gianfortuna to tell

22

"his friend" to "stop snorting," that is, ingesting cocaine; as discussed above, circumstantial evidence suggest that Gianfortuna's "friend" was Defendant. During the traffic stop of Defendant on February 15, 2006, a state trooper smelled both smoked and unsmoked marijuana in Defendant's vehicle, and found a small amount of marijuana in the vehicle's ashtray. On the same day that law enforcement officers recovered the firearms from Defendant's storage unit, a 1.4 gram quantity of marijuana was found in the refrigerator of Defendant's residence; an expert testified that this small amount of marijuana kept separate from the larger quantity of marijuana packed for distribution indicated personal use. Additionally, the Government showed that quantities of cocaine and marijuana consistent with personal use were seized from Defendant's apartment in Texas in November 2003. In light of this evidence, a reasonable trier of fact could have found that Defendant violated § 922(g)(3) beyond a reasonable doubt.

## IV.    *Brady* Claim

Defendant also asserts that the Government violated his due process rights by unlawfully withholding exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). This claim stems from the Government's failure to provide Defendant with information relating to the suspected drug trafficking activities of several individuals associated with Sandoval. This evidence, recounted in the PSR, implicates Sandoval in three incidents involving Hispanic males from whom authorities seized large quantities of cash in circumstances suggesting those individuals were transporting that money to and from Michigan as part of a drug trafficking operation. Defendant argues that this evidence identifies a number of other individuals to whom Kip Perry's and Gianfortuna's comments referencing a "traveling guy" could apply and it therefore should have been available for him to present to the jury to dispute the inference that those comments referred to him.

23

Normally, "[w]e review *de novo* the issue of whether evidence withheld by the prosecution constitutes *Brady* material." *United States v. Tarwater*, 308 F.3d 494, 515 (6th Cir. 2002) (citing *United States v. Phillip*, 948 F.2d 241, 250 (6th Cir. 1991)). However, "[w]here, as in this case, the defense counsel did not make a motion for a mistrial or raise the question of a possible *Brady* violation to the district court, we review at most for plain error." *United States v. Crayton*, 357 F.3d 560, 569 (6th Cir. 2004).[6] To meet this standard, Defendant must show an "error" that was "clear or obvious," "affected [his] substantial rights," and "'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)).

Under *Brady*, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. To establish a *Brady* violation, a defendant must make a three-part showing "that the Government suppressed evidence, that such evidence was favorable to the defense, and that the suppressed evidence was material." *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007) (citing *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)). Evidence is material for the purposes of a *Brady* claim when "there is a 'reasonable probability that, had the evidence been disclosed to the defense,' the outcome [of the trial] would

---

[6]By neglecting to state his *Brady* claim before the district court, Defendant may have waived it such that we cannot review it here for even plain error. *Crayton*, 357 F.3d at 569 n.3; *see United States v. Scarborough*, 43 F.3d 1021, 1025 (6th Cir. 1994) ("Constitutional objections 'that appear for the first time on appeal are conclusively deemed to be waived, with the effect that [the appellate court is] deprived of jurisdiction.'" (alteration in original) (quoting *United States v. Crismon*, 905 F.2d 966, 969 (6th Cir. 1990))). *But see United States v. Hayes*, 218 F.3d 615, 619–20 (6th Cir. 2000) (limiting the holding in *Scarborough* to objections that fall under the forfeiture provision of Fed. R. Crim. P. 12). We need not decide whether this is the case since the district court did not commit plain error with respect to the charged *Brady* violation.

24

have been different," where "'reasonable probability' means a probability 'sufficient to undermine confidence in the outcome.'" *United States v. Jones*, 399 F.3d 640, 648 (6th Cir. 2005) (quoting *Zuern v. Tate*, 336 F.3d 478, 484 (6th Cir. 2003)); *see also United States v. Bagley*, 473 U.S. 667, 682 (1985) (plurality opinion).

Defendant has not established that evidence of the three cash seizures involving individuals linked with Sandoval is material to his case. Defendant unsuccessfully argued to the jury that the "traveling guy" references did not apply to him, given the inconclusive nature of the "traveling guy" identifier and wiretap evidence indicating that Kip Perry had several suppliers. He now asserts that the new evidence disclosed in the PSR is material to this argument because it identifies other specific individuals to whom "traveling guy" might refer. However, neither the Government nor Defendant has any evidence linking Sandoval to Gianfortuna, Kip Perry, or any other members of the Kip Perry operation other than through Defendant himself, and the conversation between Defendant and Sandoval on February 15, 2006 indicates that they did not have dealings before that date. In contrast, of the three incidents described in the PIR, one occurred in July of 2005—well in advance of the February 15, 2006 meeting—and the other two occurred in July and August of 2006—after the March 2006 arrests of the members of the Kip Perry operation. Additionally, the context of Kip Perry's "traveling guy" statement suggests that the individual referenced was a drug supplier, while the individuals detained in these incidents only carried money. More importantly, because no evidence connects Sandoval to Gianfortuna, Defendant cannot explain why Kip Perry would ask Gianfortuna about the whereabouts of Sandoval's contacts; neither can Defendant credibly argue that the Government's stronger evidence of Defendant's involvement in the Kip Perry operation's cocaine distribution scheme—Kip Perry's reference on December 12, 2005 to "Phillip's

25

friend"—could refer to Sandoval's men. In light of these facts, it was not "clear or obvious" that the evidence described in Defendant's PSR created a "reasonable probability" of an acquittal on the cocaine conspiracy charge, so it was not plain error to consider this evidence outside the Government's *Brady* obligation.

## V.      Sentencing Determinations

Defendant's final two objections relate to his sentence. First, he challenges the district court's determination of his base offense level. The district court calculated Defendant's controlling base offense level under § 2D1.1 of the Guidelines, which derives the base offense level for various drug crimes from the drug quantities that a defendant is responsible for distributing. Due in large part to Kip Perry's statement on December 12, 2005 that "Phillip's friend" brings in 10 kilograms of cocaine and 2,000 pounds of marijuana at one time, the district court found Defendant responsible for distributing between 10,000 and 30,000 kilograms of marijuana and marijuana equivalent, leading to a total base offense level of 37.

We review a district court's sentence for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). "[A]ppellate review of sentencing decisions is limited to determining whether they are 'reasonable.'" *Id.* at 46. A significant procedural error such as improperly calculating the applicable Guidelines range renders a sentence procedurally unreasonable. *Id.* at 51. When reviewing sentencing decisions, we accept a district court's factual determinations unless clearly erroneous, but we review legal conclusions like its interpretations of the Guidelines *de novo*. *United States v. Hazelwood*, 398 F.3d 792, 795 (6th Cir. 2005).

Defendant charges as error the district court's reliance on Kip Perry's statements to determine the drug quantities involved in his base offense level calculation. He asserts that these are

26

testimonial statements on which he has not had the opportunity to cross-examine the declarant, and, as such, their use to determine his sentence violates his rights under the Confrontation Clause as interpreted in *Crawford v. Washington*, 541 U.S. 36 (2004). He argues that the district court could only establish his base offense level using the drug quantities listed in the jury's special verdict finding him guilty with respect to at least 10 kilograms of cocaine and at least 100 kilograms of marijuana, which would equate to a total base offense level of 33. However, it has long been the rule in this circuit that "[s]o long as the evidence in the presentence report bears some minimal indicia of reliability in respect of defendant's right to due process, the district court . . . may . . . consider and rely on hearsay evidence without any confrontation requirement." *United States v. Silverman*, 976 F.2d 1502, 1511 (6th Cir. 1992) (en banc) (internal quotation marks omitted). We have held on numerous occasions that this precedent survives *Crawford*. *See, e.g.*, *United States v. Paull*, 551 F.3d 516, 527–28 (6th Cir. 2009) ("*Crawford* dealt only with the content of *what* the Confrontation Clause requires and not the scope of *when* it applies. . . . The rule in *Crawford* thus does not affect the basis for *Silverman*."); *United States v. Katzopoulos*, 437 F.3d 569, 576 (6th Cir. 2006) ("[T]here is nothing specific in . . . *Crawford* that would cause this Court to reverse its long-settled rule of law that [the] Confrontation Clause permits the admission of testimonial hearsay evidence at sentencing proceedings."); *see also United States v. Brazil*, No. 09–1566, 2010 WL 3398898, at *13 (6th Cir. Aug. 30, 2010). The district court did not err by using Kip Perry's statements to determine the drug quantities for which Defendant was responsible, and, because Defendant did not challenge as clearly erroneous the court's finding that Defendant distributed between 10,000 and 30,000 kilograms of marijuana and marijuana equivalency, we cannot conclude that the court incorrectly calculated

27

Defendant's Guidelines range. Therefore, Defendant's sentence is reasonable and should be affirmed.

Second, Defendant claims that the district court erred in classifying him as an armed career criminal subject to the sentencing enhancement of the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1). However, given our decision to affirm the district court's calculation of Defendant's base offense level, we need not decide this issue. Standing alone, Defendant's conviction for possessing a firearm as a felon, with the armed career criminal enhancement, would result in a base offense level of 34 and a criminal history category of VI. *See* U.S.S.G. § 4B1.4(b)(3)(A), (c)(2). But because Defendant's drug offenses are grouped with the firearm offenses in Counts 5 and 6 for the calculation of his Guidelines range, we take the higher base offense level from these two groups of offenses, *see id.* § 4B1.4(b)(1); in Defendant's case, this is the base offense level of 37 assigned to the drug offenses. And, Defendant's total of 20 criminal history points, to which he stated no objection below, independently places him in a criminal history category of VI. *See id.* § 4B1.4(c)(1). Therefore, Defendant's status as an armed c areer criminal does not affect his sentence, and we decline to review it.

## CONCLUSION

For the reasons explained above, we **AFFIRM** Defendant Robert Ocampo's conviction and sentence.

28